**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| NAKISHA S. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-3310-CV-S-NKL |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Nakisha Watson ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for Supplemental Security Income under the Social Security Act ("the Act"), 42 U.S.C. § 1381, *et seq.* Following a November 14, 2008, hearing, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled within the meaning of the Act in a written decision dated December 2, 2008. That decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits or, in the alternative, remand. Because the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole, the Court denies Plaintiff's petition.

**I.     Factual Background**[1]

---

[1]  Portions of the parties' briefs are adopted without quotation designated.

Plaintiff filed her application for Supplemental Security Income on May 3, 2006, alleging disability due to depression and stress. Plaintiff originally alleged an onset of disability date of May 1, 2004. She is not eligible for Supplemental Security Income for the period prior to her application date and must show that she was disabled during the time her application was pending, *see* 20 C.F.R. §§ 416.330 and 416.335. She later amended her alleged onset date to November 1, 2007.

Plaintiff was born in 1976. She graduated from high school and previously worked as a medical record clerk, telemarketer, auditor, and certified nurse's assistant.

Plaintiff was hospitalized once in Germany in 2001. Available records indicate that her doctors had a "strong suspicion of depression" at that time.

On May 18, 2006, Plaintiff presented to Frances J. Anderson, Psy.D., for a consultative examination in connection with Plaintiff's disability application. Plaintiff stated that she had major depression with anxiety attacks, but she had not undergone mental health treatment for five years. Plaintiff reported that she was able to care for her children, perform household chores, do laundry, prepare meals, and shop for groceries. On mental status examination, Plaintiff was fully oriented and cooperative with logical, coherent speech and normal affective responses. She denied suicidal ideation, and there was no evidence of a thought disorder. Plaintiff had moderate impairment in her quality of thinking, mild impairment in her social judgment skills, partially adequate memory function, and impaired functioning in mathematic computation. Dr. Anderson noted that Plaintiff put forth minimal effort during portions of the mental status examination. She assessed depressive disorder,

paranoid personality traits, and a Global Assessment of Functioning (GAF) score of 60.[2]  Dr.

Anderson concluded that Plaintiff could understand and remember simple instructions;

sustain concentration, persistence, and pace for simple tasks; adequately adapt to her

environment; and adequately interact socially with limited public contact.

From May 19, 2006, through May 21, 2006, Plaintiff was hospitalized at St. John's

Regional Medical Center (St. John's) for psychiatric issues.  Plaintiff was admitted to St.

John's after police officers observed her to be agitated and speaking in a nonsensical, hyper-

religious manner; she indicated that she was speaking in tongues for religious reasons.

During her hospitalization, Plaintiff received medication for her anxiety.  After taking

medication, Plaintiff was pleasant and cooperative with no evidence of gross

psychopathology.  Plaintiff also underwent group therapy and recreational therapy.  During

the course of her hospitalization, Plaintiff was able to socialize with selective peers and she

had no episodes of "acting out behavior."  Upon discharge, Plaintiff's condition had

---

[2]    The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is rated with respect to psychological, social, and occupational functioning, and should not include physical or environmental limitations. A GAF score of between 31 and 40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See* Diagnostic and Statistical Manual of Mental Disorders, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, shoplifting) or serious impairment of social or occupational functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficultly in social, occupation, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.*  A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

improved. Her behavior was appropriate and calm, and she had no suicidal or homicidal ideation. Plaintiff's discharge diagnoses included acute psychotic disorder, and her GAF score was 50.

On March 9, 2007, Plaintiff was hospitalized at Cox Medical Center after she reported hearing voices and stated that she believed school personnel were the devil. She again indicated she was speaking in tongues. Plaintiff was treated with psychiatric medications. On March 15, 2007, Plaintiff's GAF score had improved to 65 and she was discharged. Upon discharge, Plaintiff was diagnosed with bipolar disorder type I, manic with psychotic symptoms.

From March 2007 through October 2007, Plaintiff was treated by therapist James Jarvis, Doctor of Ministry (D. Min.). On March 21, 2007, Plaintiff reported that she had some friends, and she enjoyed playing sports, going to the park with her children, shopping, and listening to music. On examination, Plaintiff was fully oriented and cooperative. She was anxious and her speech was rapid. Plaintiff's thought process was clear and goal-directed with no delusions or hallucinations. She had good memory and fair insight and judgment. Dr. Jarvis assessed a GAF score of 55. Dr. Jarvis noted that Plaintiff wanted to receive disability benefits and attend school, and she was "determined to get what she want[ed]."

The following month, Plaintiff was anxious, but her mental status was within normal limits. On July 16, 2007, Plaintiff reported that she had been able to control her temper, and

she was undergoing testing to determine what educational route would best meet her needs. She was anxious, but her mental status was within normal limits.

Three months later, Dr. Jarvis noted that Plaintiff was doing well, and her mental status was within normal limits. She was taking a full load of classes at a community college and it seemed to be going well.

Meanwhile, on June 28, 2007, Plaintiff was evaluated by psychiatrist Edgar Galinanes, M.D., in connection with Plaintiff's request for case management services through the Children's Division at Burrell Behavioral Health. Plaintiff stated that she experienced depressed mood, loss of interest in previously enjoyable activities, a desire to isolate herself and withdraw from other people, sleep and appetite disruption, irritability, and suicidal ideation. She also stated that she had a history of abuse by several family members. Plaintiff acknowledged that she could care for herself and her children, perform all types of household chores, prepare meals, manage her finances, drive a vehicle, maintain insurance coverage, shop for groceries, take her children to appointments, watch television, listen to music, attend religious services on a regular basis, and participate in activities at her church. She was currently involved in a vocational rehabilitation program and hoped to find employment. Plaintiff reported that her psychiatric medications were helpful and she denied medication side effects. However, Dr. Galinanes noted that Plaintiff did not take her medications consistently. Dr. Galinanes diagnosed recurrent, severe major depressive disorder with psychotic features and post-traumatic stress disorder. He opined that Plaintiff

had a current GAF score of 50.  Dr. Galinanes recommended that Plaintiff continue with individual psychotherapy and continue to work with a case manager to find employment.

It appears from the record that Plaintiff was self-employed as a child-care worker at some point in 2007, including into October 2007.  The transcript of her hearing indicates she was caring for children in her home.

On January 8, 2008, Plaintiff presented to Usha Manusmare, M.D., at Burrell Behavioral Health (Burrell), to begin psychiatric medication management.  Plaintiff complained of poor sleep, depression, bipolar disorder, and schizophrenia.  She stated that she enjoyed going to movies, playing board games, playing cards, and bowling.  She also stated that she took good care of her children and she was good at making friends. On examination, Plaintiff was friendly and approachable with normal speech, good eye contact, and good insight and judgment.  Her mood was slightly dysthymic. Plaintiff's thought process was logical and goal-directed. She denied hallucination and suicidal or homicidal ideation.  Plaintiff had average intellect with good abstraction skills.  Dr. Manusmare's diagnoses included bipolar disorder, panic with agoraphobia, and post-traumatic stress disorder.  Plaintiff's GAF score was 53.

On April 8, 2008, Plaintiff presented to Mildred Baluyot, M.D., at Burrell for follow-up with psychiatric medication management.  Plaintiff reported that she was "doin[g] okay." She stated that her depression and anxiety were improved with the use of medication. Plaintiff also stated that she was sleeping well at night.  A mental status examination revealed

no abnormality, but Plaintiff reported some thoughts of paranoia when she was alone.  Dr. Baluyot noted that Plaintiff's mood was fairly stabilized with the use of medication.

On June 26, 2008, Plaintiff presented to Dr. Baluyot for a medication check.  Plaintiff reported that her depression had improved and she was sleeping better.  On examination, Plaintiff claimed that her thoughts raced at times and she continued to be a "little" anxious and irritable.  She was friendly with normal speech, good eye contact, and moderate energy level.  Plaintiff had no hallucinations, delusions, or suicidal ideation, but sometimes she felt people were "out to get her."  Dr. Baluyot noted that Plaintiff was content with her medications and her mood seemed to be stabilized.  Dr. Baluyot instructed Plaintiff to continue her current medications.

On August 20, 2008, Plaintiff presented to Dr. Baluyot for a medication check.  Plaintiff reported that things were "okay," but she was having problems with her children and moving to a new home.  Plaintiff claimed that she continued to feel depressed and anxious, but she was sleeping better.  She denied irritability and suicidal ideation, but she claimed that her thoughts raced at times.  On examination, Plaintiff had normal speech and a moderate energy level.  She had no hallucinations, delusions, or paranoid thoughts.  Dr. Baluyot noted that Plaintiff reported some depressive symptoms, but she was "stressed out" due to issues with her children and moving.

A psychiatric nurse practitioner, Peggy Vecoli, apparently worked on Plaintiff's case with Drs. Manusmare and Baluyot.  On September 9, 2008, Ms. Vecoli completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment.

Ms. Vecoli opined that Plaintiff was moderately limited in her ability to make simple work-related decisions, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions. Ms. Vecoli opined that Plaintiff was markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions from supervisors, respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others.

### A.    Plaintiff's Testimony

Plaintiff testified at the November 14, 2008, hearing. She stated that her only income was the disability income of her two children. She was taking various psychiatric medications and a case worker was coming to her house once a week to help assure that she was taking her medications and attending her medical appointments. Plaintiff indicated that her doctors were trying to determine whether she had lupus, and that she had recently had

gallbladder surgery.  Plaintiff indicated that she has depression, anxiety, trouble with strangers and crowds, and that she does not sleep well.  She testified to her past work history. Plaintiff described daily life activities such as caring for her children – then nine and thirteen – and their schooling, household chores, grocery shopping, using the computer, talking on the phone, attending church twice a week and having Bible study at her home.  Plaintiff said she wants to return to school but is not ready to do that.

## B.    Vocational Expert Testimony

A vocational expert ("VE") testified at the hearing.  She testified that a hypothetical claimant limited to lifting no more than thirty pounds frequently, limited to simple tasks and instructions, and requiring no more than occasional interaction with the general public would not be able to perform Plaintiff's past work.  The VE testified that a claimant of Plaintiff's age, education, and past experience and the limitations set forth in the previous sentence would be able to perform work available in significant numbers in the economy such as housekeeping and production assembler.   She testified that a claimant limited as indicated in Ms. Vecoli's Medical Source Statement would not be able to perform jobs available in significant numbers in the economy.

## C.    The ALJ's Decision

In his written decision, the ALJ set forth the requisite five-step process for making disability determinations, *see* 20 C.F.R. §§ 404.1520 and 416.920, as well as the process for determining functional limitations caused by mental impairments, *see* 20 C.F.R §§ 404.1520a and 416.920a.   The ALJ found that Plaintiff had the severe impairments of depression,

anxiety, and bipolar disorder.  He found that those impairments did not meet or medically equal a listed impairment.

The ALJ determined that Plaintiff had the following residual functional capacity for work ("RFC"): the ability to sit or stand/walk approximately six hours in an eight-hour workday with normal breaks; the ability to frequently life up to thirty pounds; must be limited to simple instructions and simple tasks; must be limited to work involving no more than occasional interaction with the general public.  The ALJ discussed Plaintiff's medical records, including those of the consulting examiners.  The ALJ noted that one examiner felt Plaintiff put forth minimal effort on testing.  He also noted that Dr. Jarvis, Plaintiff's counselor, noted her determination to "get what she wants," which included "disability and going to school," and that Plaintiff seemed to be doing well taking a full load of classes at community college in October 2007.  The ALJ noted Ms. Vecoli's Medical Source Statement form, as well as the records from Drs. Baluyot and Galinanes indicating that Plaintiff was "OK" and improving.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.  The ALJ noted Plaintiff's daily life activities – including her ability to attend college – and the statements of her mental health care providers, finding that she engages in a generally normal range of activities.  The ALJ stated that the record indicated that Plaintiff views disability benefits as a way to support herself while continuing her studies.  The ALJ also noted Plaintiff's sporadic and usually low

work activity prior to her alleged disability, finding an indication that Plaintiff was not motivated to engage in productive activity. The ALJ gave little weight to Ms. Vecoli's opinion, finding it clearly inconsistent with Plaintiff's own description of her daily life activities and other medical evidence of record.

The ALJ then determined that, although Plaintiff was unable to perform her past relevant work, she retained the ability to perform other work that existed in significant numbers in the national economy. Consequently, the ALJ found Plaintiff was not disabled.

## II. Discussion

Plaintiff appears to argue that the ALJ erred in determining her RFC, in that his RFC determination is not based upon substantial evidence and he failed to give appropriate weight to Ms. Vecoli's Medical Source Statement. Plaintiff takes issue only with the ALJ's findings regarding her mental, as opposed to physical, status.

The ALJ found that Plaintiff had not met her burden of showing that she was entitled to benefits: he found she had not shown that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment which lasted or could be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(A). The Court will affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. *See McNamara v. Astrue*, 590 F.3d 607, 611 (8th Cir. 2010). If substantial evidence supports the decision, the Court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the Court] may have reached a different outcome." *Id.*

## A. The ALJ Properly Determined RFC

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence. RFC is a "function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). Put another way, RFC is the most an individual can do despite the combined effect of all credible limitations. 20 C.F.R. § 416.945. In assessing a claimant's RFC, the ALJ may reject the examining medical opinions if they are inconsistent with substantial evidence. *See Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). While the ALJ's decision must be based on some medical evidence, the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (internal quotation omitted).

In reaching RFC determinations, ALJs must evaluate the credibility of a claimant's complaints of limitation within the framework set forth in 20 C.F.R. § 416.929 (2009), and *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). That framework requires consideration of such factors as: the claimant's work history; observations by third parties and physicians regarding the claimant's disability; the claimant's activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; and the dosage, effectiveness and side effects of medications. *See Polaski*, 739 F.2d at 1322. Where an ALJ discredits a claimant's testimony for stated reasons, reviewing courts normally defer to the ALJ's credibility findings. *See Russell v. Sullivan*, 950 F.2d 542, 545 (8th Cir. 1991).

Here, substantial medical and other evidence supports the ALJ's RFC determination. As the ALJ noted, several mental status examinations of Plaintiff were normal, including the following: in January 2008, Dr. Manusmare, a treating physician, noted that Plaintiff was friendly and approachable with normal speech, eye contact, and good insight and judgment; in June 2008, Dr. Baluyot, another treating physician, reported similar findings; and Dr. Anderson, an examining physician, found no evidence of a thought disorder. Dr. Anderson also found that Plaintiff could perform simple tasks, and adequately interact socially with limited public contact. Though Plaintiff was hospitalized during the relevant time period for psychiatric issues, her condition improved significantly after medication and therapy. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (finding that impairments that are controllable or amenable to treatment do not support a finding of disability). Plaintiff repeatedly informed treatment providers that psychiatric medications were effective and improved her symptoms. The record reflects regular GAF scores of 50 to 65, generally indicating moderate to mild symptoms. Dr. Galinanes, a treating physician, noted that Plaintiff reported no medication side effects.

Plaintiff's own reports indicate that her daily living activities were generally normal. She cared for two young children as well as herself, performed housekeeping tasks, prepared meals, drove a car, shopped for groceries, managed her finances, and watched television. She repeatedly indicated that she had no difficulty getting along with others or following short instructions. Plaintiff attended regular religious services and activities at her church. At one point after she filed for disability benefits, she was taking a full load of community

college classes.  Plaintiff's ability to engage in many normal daily living activities is inconsistent with her allegation of disability.  *See Johnson v. Apfel*, 240 F.3d 1145, 1148-49 (8th Cir. 2001).

Also weighing against Plaintiff is her inconsistent work record.  "A lack of work history may indicate a lack of motivation to work rather than a lack of ability."  *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).

### 1.    The ALJ Properly Addressed the Nurse Practitioner's Opinion

Plaintiff argues that the ALJ incorrectly stated that Ms. Vecoli, the nurse practitioner, is not an "acceptable medical source."  In fact, as opposed to an "acceptable medical source," a nurse practitioner is considered an "other" medical source under the Act whose opinion is not accorded the controlling weight afforded "treating sources."  *See* Social Security Ruling ("SSR") 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006).  As such, Ms. Vecoli's assessment cannot be afforded controlling weight.

However, "Opinions from [other] medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*; *see also* 20 C.F.R. § 416.913(d) (information from medical sources other than licensed physicians, including information from treating nurses, may be used to show the severity of an impairment).  ALJs "generally should explain the weight given to opinions from these or 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow

the adjudicator's reasoning." *Id.* Because these opinions are important and useful to a disability determination, if an ALJ decides to give an opinion from an acceptable medical source more weight than one from another medical source – like a nurse practitioner – the ALJ must explain the reasons for doing so. *See* SSR 06-3p.

Here, Ms. Vecoli's opinion is inconsistent with treatment notes of physicians in her office, as well as other records of Plaintiff's treatment and evaluation. Contrary to the extreme limitations listed in Ms. Vecoli's Medical Source Statement, as discussed above, multiple mental status examinations were normal and Plaintiff's impairments were controlled with treatment. Plaintiff's daily activities belie the constraints listed on Ms. Vecoli's check-box form. *See Holmstrom v. Massanari,* 270 F.3d 715, 721 (8th Cir. 2001) (indicating that treating physicians' RFC assessment which appear in checklist format may be limited in their evidentiary value). The ALJ discussed Ms. Vecoli's opinion, and his decision to reject it is supported by substantial record evidence.

## 2. The ALJ Based His Decision on an Adequate Record

Plaintiff seems to argue that the ALJ should have further developed the record by recontacting Ms. Vecoli. However, where an ALJ discounts an opinion because it is inconsistent with other substantial evidence, the ALJ is not required to seek additional clarification. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

To the extent Plaintiff is arguing that the ALJ should have otherwise further developed the record, such action was unnecessary. There is no indication that the ALJ felt unable to make the assessment he did based on the evidence in the record. He was not

required to order an additional examination. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57

(8th Cir. 2005) (finding that the ALJ did not err by failing to order additional assessments

where "there [was] no indication that the ALJ felt unable to make the assessment he did and

his conclusion [was] supported by substantial evidence.").

    The ALJ properly evaluated the evidence of record in making his RFC determination.

His decision is supported by substantial evidence in the record.

## III.    Conclusion

    Accordingly, it is hereby ORDERED that Plaintiff's petition [Doc. # 1] is DENIED.


                                        s/ NANETTE K. LAUGHREY
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated: March 22, 2010
Jefferson City, Missouri